IN THE COURT OF APPEALS OF TENNESSEE

EASTERN SECTION

FILED

July 28, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| JASON SCOTT WILLIAMS | ) | CLAIMS COMMISSION |
| | ) | |
| Claimant-Appellee | ) | NO.  03A01-9610-BC-00338 |
| | ) | (Claims Commission No. 02483) |
| v. | ) | |
| | ) | |
| STATE OF TENNESSEE | ) | |
| | ) | |
| Defendant-Appellant | ) | AFFIRMED AND REMANDED |

CHARLES W. BURSON, Attorney General and Reporter, and George H. Coffin, Jr., Assistant Attorney General, OF NASHVILLE FOR APPELLANT

JAMES H. LONDON OF KNOXVILLE FOR APPELLEE

O P I N I O N

Goddard, P.J.

This claim was heard by the Tennessee Claims Commission on October 14, 1992.  A judgment was rendered September 12, 1996, holding the State liable for damages for the injuries sustained by the Claimant when he jumped from a stalled elevator in a dormitory at East Tennessee State University.

The Commissioner found that the negligence of the State was 75 percent, and that of the Claimant, Jason Scott Williams, was 25 percent.  He thereupon entered judgment against the State

in the amount of $181,875, being 75 percent of the $242,500

damages he found were suffered by Mr. Williams.


The State appeals, raising the following three issues:


I. WHETHER THE COMMISSIONER ERRED IN DETERMINING THAT THE DEFENDANT BREACHED A DUTY OF CARE OWED TO THE CLAIMANT?

II. WHETHER THE COMMISSIONER ERRED IN CONCLUDING THAT DEFENDANT'S DEVIATION FROM ITS PROCEDURE AND NOT THE PLAINTIFF'S CONDUCT IN PRYING OPEN ELEVATOR DOORS AND JUMPING OUT AND FALLING DOWN THE ELEVATOR SHAFT WAS THE PROXIMATE CAUSE OF HIS INJURIES?

III. WHETHER THE COMMISSIONER ERRED IN ADMITTING THE TESTIMONY OF A MEDICAL EXPERT WITNESS IN THIS CASE?


Because we find, as to the first two issues, that the

evidence does not preponderate against the Commissioner's

findings of fact, and as to the third, that any error in

admitting the testimony of the medical expert was harmless, we

affirm the judgment of the Commissioner.


The Claimant was 19 years old when the accident

occurred. He was a former student at East Tennessee State

University. He and a friend, Shane, were visiting the campus to

assist Shane's girlfriend, Cara, in moving into the Lucille

Clement Hall, a five-story dormitory served by one or more

automatic elevators, in good working order.


Cara's room was on the fifth floor. After about two

hours, the Claimant, Shane, and Cara left her room and summoned

the elevator which, as it developed, was already at the fifth

2

floor.  In addition to these three, the Resident Assistant of the dormitory and her boyfriend entered the elevator[1] which began its descent after the first floor button was pushed.  It stopped about half-way to the fourth floor, and the Resident Assistant rang the alarm bell.  After waiting about a minute, she again rang the alarm bell, but nobody responded.  The Claimant says he heard "clanking noises"[2] and after about two minutes, Shane pried the door open and jumped four feet to the fourth floor without mishap.

Shane thereupon motioned to the Claimant "that I was to be the next one to jump."  The Claimant testified:

> I was perched on the edge both feet flat on the floor facing forward.  I paused maybe fifteen or twenty seconds, and then I leaped forward. . . .  I can very vaguely remember hitting my head on something.  I can't really recall what or where.  The next thing I can remember is that it's pitch black and I'm falling.

His recollection then becomes somewhat obscured, but concludes that after he jumped he struck his head and somehow fell backwards under the elevator and consequently down the shaft.

The elevator stopped because the electrical power was interrupted.  Someone had dropped a ring of keys down the shaft and the security or maintenance crew, in accordance with University policy, brought the elevator to the first floor, to be

---

[1]     The car was 6 X 4 feet, with two doors, each apparently three feet wide.  This fact is somewhat obscured because a letter from the Claimant's counsel to the State's counsel describes "one door three feet wide."

[2]     Apparently caused by the positioning of a ladder at the bottom of the elevator shaft.

kept in place while someone went to the basement to retrieve the keys. The security officer instructed a student employee to keep the elevator on the first floor. She nevertheless disregarded this instruction and allowed the elevator to rise to the fifth floor. When the security officer opened the basement door allowing access to the bottom of the shaft, the power to the elevator was automatically interrupted, thus stranding it for a period of three to five minutes, which motivated the Claimant to make his exit.

The Commissioner held that the State's conduct in failing to take the elevator out of service was a lack of due care because it violated standard procedures, and that such failure was a proximate cause of the accident. Thereupon, as already noted, he apportioned 25 percent of the fault to the Claimant and 75 percent to the State.

Our review is de novo on the record, accompanied by a presumption that the findings of fact of the trial court are correct unless the evidence otherwise preponderates. Rule 13(d), Tennessee Rules of Appellate Procedure. There is no presumption of correctness with regard to the Commission's determination of questions of law. NCNB Nat. Bank v. Thrailkill, 856 S.W.2d 150, (Tenn.App.1993).

There are five classical elements of common law negligence: a duty of care owed by the defendant to the plaintiff, a breach of that duty by a lack of due care, an injury or loss, causation in fact and proximate or legal causation. McClenahan v. Cooley, 806 S.W.2d 767 (Tenn.1991). Proximate

4

cause sufficient to impose liability on the defendant consists of four elements: (1) a foreseeable risk; (2) the defendant's conduct was a substantial factor as a cause in fact of the harm; (3) whether the plaintiff's conduct was 49 percent or less proportionately responsible for the harm; and (4) whether there is a legal rule or policy which relieves the defendant from liability. <u>McIntyre v. Balentine</u>, 833 S.W.2d 52 (Tenn.1992).

The Commissioner found that it was reasonable for the Claimant to conclude that it was necessary to exit the elevator to preclude the risk of serious injury. He reasoned that the temperature inside the elevator and the clanging noises the Claimant heard in combination justified his hasty exit. In this regard, Mr. Williams testified as follows:

Q. Who got in the elevator with you?

A. Myself, Shane, Cara, there was a Resident Assistant for that floor, I can't recall her name, and her boyfriend, and I can't recall his name.

Q. Now, was anybody on the elevator when the doors opened or was it empty?

A. It was empty.

Q. So it was empty and all of you got on?

A. Right.

Q. Okay. After you all got on, what did you do next? Did you punch a button to go down?

A. We punched the button to go to the first floor.

Q. Did the elevator doors shut?

A. Yes, they did.

Q. And how far did the elevator descend?

A. It was hard for us to tell. It was moving perfectly fine and then, for a while, it seemed like it

5

wasn't moving at all and we didn't feel any motion and it didn't feel like it was really solid either.  It was just kind of - almost felt like it was floating is the best way I can describe it.  After a short period of time, I came to the conclusion that it was not moving.

Q.  Did anybody ring the alarm bell?

A.  Yes, the Resident Assistant, and I can't recall her name, rang the alarm bell.  I heard it.

Q.  What happened when you rang the alarm bell?

A.  The alarm sounded and I heard it and it was in working condition.

Q.  Did anybody come to your assistance?

A.  No.  I did not hear anyone come to say that someone was on their way.  I didn't hear anything.

Q.  What happened next?

A.  After waiting, I guess another minute, maybe two, the Resident Assistant sounded the alarm again and it sounded, I heard it.  It was working.

Q.  Did anybody come to your assistance that time?

A.  No.

Q.  Then what happened?

A.  I heard clanking noises.  I can't really say they were coming from below or above or where.  It sounded like it was definitely coming from within the shaft itself.

Q.  Now, what type of clanking noise are we talking about?

A.  It was like just a series of noise.  It sounded like something descending or ascending.

Q.  Did it sound like metal?

A.  Yes.

Q.  Then what happened?

A.  Well, after waiting another two, maybe three minutes, Shane went for the door and pried it open.

Q.  Now, Shane was your friend.  During this whole period of time, how many people were on the elevator?

A.  Five, including myself.

6

Q. How long do you believe that you were in this elevator before you tried to get out?

A. I would approximate five minutes. That would be my best guess.

Q. What was the temperature like in there?

A. It was very hot. That building is not air conditioned. It was the end of August and there were five people in a small space and I was beginning to feel claustrophobic.

Q. Were you in fear of your life?

A. Yes.

Q. Why?

A. When I heard those clanking noises, I felt that the elevator was not in any real stable position. I feared that it would fall and I would die and everybody else in it.

Q. What was your understanding about prior problems with that elevator?

A. It was my understanding that those elevators on campus did tend to break down which told me that they probably were not in particularly good condition and that anything could and possibly would happen.

Q. Shane pries the elevator door open, what does Shane do?

A. Shane jumps to the floor below. I would guess it was about four feet that he jumped. We were in between floors.

Q. And then you jumped?

A. Right. Shane looked around some and then he motioned for me that I was to be the next one to jump. I was perched on the edge both feet flat on the floor facing forward. I paused maybe fifteen or twenty seconds, and then I leaped forward.

Q. What happened?

A. I can very vaguely remember hitting my head on something. I can't really recall what or where. The next thing that I can remember is that it's pitch black and I'm falling.


We reiterate that our review of the record persuades us

that the evidence does not preponderate against the

7

Commissioner's finding of fault as to the State or his apportionment thereof between the parties.

As to the final issue, the Commissioner admitted the evidence of a medical expert that the Claimant acted reasonably in prying open the doors and jumping from the elevator, which had the untoward result of his falling down the elevator shaft.

First, we observe that the trial court is accorded wide discretion in the admission or rejection of expert testimony. Otis v. Cambridge Mutual Fire Ins. Co., 850 S.W.2d 439 (Tenn.1992); Buchanan v. Harris, 902 S.W.2d 941 (Tenn.App.1995).

Assuming, however, that the evidence was erroneously admitted, upon our excluding it, we nevertheless find upon viewing the record de novo, that the Claimant's actions under the circumstances then obtaining--although not blameless--contributed, as found by the Commissioner, 25 percent to the injuries he sustained.

For the foregoing reasons the judgment of the Commissioner is affirmed and the cause remanded for collection of the judgment and costs below.  Costs of appeal are adjudged against the State.

_____
Houston M Goddard, P.J.

8

CONCUR:

_____
Charles D. Susano, Jr., J.

_____
William H. Inman, Sr. J.

FILED

**July 28, 1997**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

JASON SCOTT WILLIAMS,          )    CLAIMS COMMISSION
                               )
    Plaintiff/Appellee         )      NO.  03A01-9610-BC-00338
                               )    (Claims Commission No. 02483)
v.                             )
                               )
STATE OF TENNESSEE,            )
                               )
    Defendant/Appellant        )
                               )

# D I S S E N T

_____INMAN, Senior Judge

I regret my inability to concur with the majority opinion. Given the less than fully developed facts of this accident[3] I think the majority opinion may be rationally cited for the proposition that the owner of an elevator is, *ipso facto,* a guarantor of the safety of the passengers thereon.

The claimant was 19 years old when the accident occurred. He was a former student at East Tennessee State University. He and a friend, Shane, were visiting the campus to assist Shane's girlfriend, Cara, in moving into the Lucille Clement Hall, a five-story dormitory served by one or more automatic elevators, in good working order.

Cara's room was on the fifth floor. After about two hours, the claimant, Shane, and Cara left her room and summoned the elevator which, as it developed, was already at the fifth floor.

---

[3]Apparently because the State believed that the claim was so ill-founded that only a minimal effort was required on its part.

10

In addition to these three, the Resident  Assistant of the dormitory and her boyfriend entered the elevator which began its descent after the first floor button was pushed.  It stopped about half-way to the fourth floor, and the Resident Assistant rang the alarm bell.  After waiting about a minute, she again rang the alarm bell, but nobody responded.  The claimant says he heard "clanking noises" and after about two minutes, Shane pried the door open and jumped four feet to the fourth floor without mishap.

Shane thereupon motioned to the plaintiff  "that I was to be the next one to jump."  The plaintiff testified:

> " . . . I was perched on the edge both feet flat on the floor facing forward.  I paused maybe 15 or 20 seconds and then I leaped forwards . . . I can very vaguely remember hitting my head on something.  I can't really recall what or where.  The next thing I can remember is that it's pitch black and I'm falling . . . "

His recollection then becomes somewhat obscured, but concludes that after he jumped he struck his head and somehow fell backwards under the elevator and consequently down the shaft.

The elevator stopped because the electrical power was interrupted.  Someone had dropped a ring of keys down the shaft and the security or maintenance crew, in accordance with University policy, brought the elevator to the first floor, to be kept in place while someone went to the basement to retrieve the keys.  The security officer instructed a student employee to keep the elevator on the first floor.  She nevertheless allowed the elevator to rise to the fifth floor, and when the security officer opened the basement door allowing access to the bottom of the shaft, the power to the elevator was automatically interrupted, thus stranding it for a period of three to five

11

minutes, which motivated the plaintiff to make his hasty and ill-advised exit.

The Commissioner held that the State's conduct in failing to take the elevator out of service was a lack of due care because it violated standard procedures, and that such failure was the proximate cause of the accident, although he apportioned 25% of the fault to the plaintiff.

There are five classical elements of common law negligence: a duty of care owed by the defendant to the plaintiff, a breach of that duty by a lack of due care, an injury or loss, causation in fact and proximate or legal causation. *McClenahan v. Cooley,* 806 S.W.2d 767, 774 (Tenn. 1991). Proximate cause sufficient to impose
liability on the defendant consists of four elements: (1) a foreseeable risk; (2) the defendant's conduct was a substantial factor as a cause in fact of the harm; (3) whether the plaintiff's conduct was 49% or less proportionately responsible for the harm; and (4) whether there is a legal rule or policy which relieves the defendant from liability. *McIntyre, supra.*

Where the plaintiff is 50% or more responsible for the harm, he cannot recover, *McIntyre, Eaton, supra.*

As propounded in *Eaton* at 590, the question is: assuming that both plaintiff and defendant have been found guilty of negligent conduct that proximately caused the injuries, was the *fault attributable to plaintiff equal to or greater than the fault attributable to the defendant?*

I may refer to familiar legal principles for a determination of this issue. Some of these, *e.g.,* contributory negligence, remote contributory negligence, last clear chance, assumption of risk, sudden emergency, and the rescue doctrine, have been

12

subsumed by the comparative fault doctrine.  *Eaton* enumerates the non-exclusive factors which determine proportional fault:

> (1) the relative closeness of the causal relationship between the conduct of the defendant and the injury to the plaintiff;(2) the reasonableness of the party's conduct in confronting a risk, such as whether the party knew of the risk or should have known of it; (3) the extent to which the defendant failed to reasonably utilize an existing opportunity to avoid the injury to the plaintiff; (4) the existence of a sudden emergency requiring a hasty decision; (5) the significance of what the party was attempting to accomplish by the conduct, such as an attempt to save another's life; and (6) the party's particular capacities, such as age, maturity, training, education and so forth.

The Commissioner found that it was reasonable for the plaintiff to conclude that it was necessary to exit the elevator to preclude the risk of serious injury.  He reasoned that the temperature inside the elevator and the clanging noises the plaintiff heard in combination justified his hasty exit when superimposed upon the testimony of Dr. Martin Gebrow, a psychiatrist, that the plaintiff acted reasonably in jumping out of the elevator.[4]

My concern is not with the lack of evidence of negligence on the part of the State.  Its agents were derelict in their duty to follow established procedures, and it is not profitable to discuss the liability of the State (other than a brief reference to the issue of foreseeability) in light of the overriding principle that the equal or greater negligence of the plaintiff is clearly apparent and consequently is destructive of his claim under the established doctrine of comparative negligence.

The plaintiff testified that he jumped from the elevator because (1) the interior was hot, (2) he heard clanging noises, and (3) he feared the elevator would fall.

---

[4]The State's objection to such testimony should have been sustained.

The elevator had been stopped for three to five minutes. The alarm was twice sounded. There was *no real cause for concern*. A *reasonable* person should have known that there was a *greater* risk in jumping from the elevator under the circumstances. He was aware of its position four feet above the fourth floor; his friend Shane made the leap successfully and motioned to the plaintiff to follow him; he was then 19 years old, had never heard of an elevator falling, and was sufficiently mature to gauge the respective merits of remaining in the elevator or leaping from it under *the suasion of his friend.* The Commissioner found that plaintiff did not use due care in his method of leaving the elevator, a finding with which I concur. I do not agree that the plaintiff should only be charged with 25% of the responsibility for his accident; whatever a proper apportionment might be, in my judgment 50% or more of the fault which occasioned this accident should be attributable to the plaintiff.

The State argues that the Commission has made it the insurer of the safety of all persons using the elevator, a role not contemplated by negligence law. *See, Roberts v. Roberts,* 845 S.W.2d 225 (Tenn. App. 1992). I agree, because the plaintiff has made no showing from which "it can be said that the State *reasonably knew or should have known of the probability of an occurrence such as the one that caused the plaintiff's injuries."*

Foreseeability is the test of negligence, and it cannot be said that the State reasonably should have foreseen that an occupant of a stalled elevator would, less than five minutes after being stranded, undertake a departure in the manner shown. The test of reasonableness is an objective one; how would a reasonable person gauge the risks, and how would he react? The

14

Commissioner applied an impermissible subjective standard, one that is entirely dependent upon the plaintiff's perception of the risk factors, those being the temperature,[5] the clanging noises, and fear of falling.

The plaintiff's exit from the elevator was, at once, unnecessary, unthoughtful, and likely the product of impatience or bravado, on the one hand, and negligently performed, on the other, as evidenced by the successful departure of Shane. His conduct in confronting the perceived risk was not reasonable, *Eaton, supra,* since *he was unwilling to tolerate a few moments of inconvenience.* A stalled elevator is a not uncommon occurrence,[6] because it is powered by electric current which occasionally may be interrupted. If the *circumstances are exigent*, a decision to exit may be justified even though hindsight judgment proved the exit was improvident, but here the circumstances were not exigent and the plaintiff merely allowed himself to follow the example of Shane. I can find no precedential authority in this jurisdiction or elsewhere which impresses liability upon the owner of an elevator under similar facts.

_____
William H. Inman, Senior Judge

---

[5]There is no evidence of the temperature in the elevator. It may logically be inferred that, even absent air-conditioning in August, the temperature in all probability was not beyond endurance after five minutes' confinement. Whether the elevator was equipped with a fan is not shown.

[6]Hence, the alarm bell.

15